[646 NYS2d 336]

Dale A. Kagan, Respondent, v State of New York, Appellant.

Second Department, June 17, 1996

## APPEARANCES OF COUNSEL

*Dennis C. Vacco, Attorney-General,* New York City *(Peter G. Crary* and *Victor Paladino* of counsel), for appellant.

*Koob & Magoolaghan,* New York City *(Elizabeth L. Koob* of counsel), for respondents.

## OPINION OF THE COURT

MILLER, J. P.

It is well settled that the State owes a duty to its incarcerated citizens to provide them with adequate medical care. Today, we reaffirm that principle and uphold, in large measure, an award of damages to an inmate who lost the hearing in one ear as a result of endemic and systematic indifference to her repeated, legitimate medical complaints by the security and medical staff at Bedford Hills Correctional Facility.

The Court of Claims found that prison employees had committed acts of ministerial negligence and awarded damages in the total amount of $304,000 for the: (1) failure to provide adequate bedding; (2) failure to provide adequate medical care resulting from the delays in presenting the claimant for nurse's screenings; and (3) unreasonable, six-month delay before providing a comprehensive hearing evaluation. While the court's *sua sponte* adoption of a theory of ministerial negligence is not clearly explained, contrary to the conclusion reached by the dissent, we sustain the judgment except as to the failure to provide adequate bedding. The claimant has proved her case under any one of three distinct legal theories.

The facts underlying this appeal warrant close scrutiny. While temporarily housed in a "satellite unit" of the Bedford Hills Correctional Facility (hereinafter Bedford Hills) in late 1987, the claimant, Dale Kagan, repeatedly requested, and was denied, additional bedding during a cold spell. Instead, she was told by the Sergeant to "sleep in [her] coat". Allegedly as a result of the failure to provide the claimant with adequate bedding, she developed an upper respiratory infection.

Medical treatment to prisoners at Bedford Hills is supposed to be provided, in the first instance, by nurses who see and

screen prisoners. The nurses treat minor injuries and conditions themselves, and they refer the more serious cases to a physician on the prison staff. This system is designed to provide an on-site triage and screening procedure that is required before an inmate can be scheduled for a physician's appointment. On or about December 26, 1987, the claimant signed up for a nurse's screening but she was unable to remain to complete the appointment.

At first, her cold symptoms appeared to subside, but when they resurfaced, the claimant signed up repeatedly for nurse's screenings. As early as January 2, 1988, the claimant's medical record had a notation for a follow-up visit with a doctor. On January 3, the claimant indicated on the sign-up sheet that she had a bleeding ear and specifically requested to see Dr. Blumenfeld. On January 4 the floor officer recorded the claimant's request for a physician's appointment because she had an infected and bleeding ear as early as 8:14 A.M. It was not until 2:30 P.M., after the on-duty physician had already left the facility for the day, that the claimant was presented for a nurse's screening, and the nurse attempted to locate a doctor for her. Moreover, on January 5, the floor officer recorded the claimant's runny ear and vomiting as early as 7:30 A.M. However, it was not until later that day, after she had endured days of pain, fluid, and a bloody discharge from her ear, repeated vomiting, and lost first her equilibrium, then the hearing in her right ear, that the claimant was at long last "squeezed in" for a doctor's appointment off site, even though on each preceding day a doctor was present and available at the facility, and when one was not available on site, one was always available on an "on call" basis. The evidence adduced at trial demonstrated that this delay of diagnosis and treatment proximately caused the claimant to lose the hearing in her right ear.

The claimant commenced the instant action with a *pro se* claim that did not mention, much less rely upon, any distinct legal theories of liability. Later, her attorneys served a medical malpractice certificate of merit and counsel's opening statement clearly raised claims of negligence. The Court of Claims found that there had been no medical malpractice, but that the claimant had suffered injuries as a result of actionable ministerial neglect. Regardless of the label to be attributed to the theory of liability, the claimant established that she was owed a duty of care which, in part, was breached as a result of ministerial neglect. Furthermore, as an alternate ground in

support of affirmance *(see, Parochial Bus Sys. v Board of Educ.,* 60 NY2d 539), we find that the evidence demonstrated that the claimant proved her entitlement to recover damages under theories of medical malpractice and general negligence as well. There were numerous concurrent causes for the claimant's injuries. While a rose by any other name would smell as sweet, the name one attributes to the negligent acts committed by prison personnel in this case cannot mask the inescapable conclusion that as a direct result thereof, the claimant lost the hearing in one ear.

### MINISTERIAL NEGLECT

A ministerial matter "shall mean an administrative act carried out in a prescribed manner not allowing for substantial personal discretion" (Public Officers Law § 73 [1] [d]). It is further established that there is no governmental immunity for the negligent performance of these ministerial duties *(see, Marx v State of New York,* 169 AD2d 642; *National Westminster Bank v State of New York,* 155 AD2d 261, *affd* 76 NY2d 507). Although ministerial duties have more traditionally been attributed to administrative acts, such as the recording of deeds and the timely signing and return of warrants, they also include the release of prisoners from disciplinary confinement *(see, Gittens v State of New York,* 132 Misc 2d 399) and the care of prisoners.

The Court of Appeals has defined discretionary or quasi-judicial acts as "involv[ing] the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result" *(Tango v Tulevech,* 61 NY2d 34, 41). We shall demonstrate herein that nondiscretionary medical standards, known as "protocols", had been adopted by Bedford Hills. These protocols governed administration of medical care to prisoners. The claimant demonstrated that several of these protocols were breached and as a direct result thereof, she lost her hearing. Therefore, the claimant's claims can be characterized as a form of ministerial neglect.

The rendering of medical services to prisoners at Bedford Hills has been the subject of prior litigation, as the care provided has previously been found to be less than desirable. In *Todaro v Ward* (431 F Supp 1129, 1160, *affd* 565 F2d 48) it was found that because the "administrative and record keeping procedures at Bedford Hills [were] grossly inadequate",

new safeguards and protocols would be instituted to conduct sick call, to provide adequate nurse screening and reasonably prompt access to a physician, and to insure that medical appointments were scheduled. In the instant case Bedford Hills failed to meet these obligations, and in the process violated its own administrative protocols. As was explained by the court in *Todaro v Ward (supra),* the appointed court monitor specifically criticized Bedford Hills' nurses for not looking at prior screening notations to enable them to evaluate the patient as presenting with a continuing problem. Such omissions continued with the care provided to the claimant.

It is settled that an inmate, who "must rely on prison authorities to treat [the inmate's] medical needs" *(Estelle v Gamble,* 429 US 97, 103), "has a fundamental right to 'reasonable' * * * and 'adequate' * * * medical care" *(Powlowski v Wullich,* 102 AD2d 575, 587). Further, it is the State's duty to render medical care "without undue delay" and, therefore, whenever "delays in diagnosis and/or treatment [are] a proximate or aggravating cause of [a] claimed injury", the State may be liable *(Marchione v State of New York,* 194 AD2d 851, 855). In *Stanback v State of New York* (163 AD2d 298) the failure to promptly and correctly diagnose an inmate's injured knee resulted in an unreasonable delay of treatment. There, the Court stated "[t]hese acts and omissions amount to something more than an honest error in professional judgment" *(supra,* at 298). The same can be said of the failure of Bedford Hills to provide the claimant with adequate medical care after she signed up for a nurse's screening and requested to see a physician on three consecutive days, and complained of a bleeding ear as early as January 3, a condition that the State's witness, Nurse Rosado, testified qualifies as an emergency, requiring immediate medical attention. Bedford Hills failed to meet its duty of care because it was ministerially negligent in complying with its own administrative procedures as set forth in its own, mandated, protocols.

*THE PROTOCOLS*

The evidence established that prison personnel violated numerous distinct administrative protocols which were implemented in the wake of *Todaro (supra)* to improve medical care to prisoners. As a result, the claimant was denied prompt attention which would have preserved her hearing. They include: (1) failure of correction officers to notify medical staff when, between nurse's screenings, an inmate requests to see a physician, (2) failure to have the inmate presented at the first

screening session following the inmate's request, (3) failure to note the need to schedule an appointment with a physician on the screening sign-up list or screening roster, (4) failure to have the inmate's record available at nurse's screenings, (5) failure to transcribe the health problems from the sign-up sheet onto the screening roster, and (6) failure to provide a prompt, comprehensive hearing test.

Inasmuch as the dissent minimizes the multiple breaches of protocol that were the only apparent proximate cause of the claimant's permanent hearing loss, we find it necessary to refer in detail to the specific protocols that were not complied with.

The applicable protocol for most of the infractions alleged is that entitled "SICK CALL AND PHYSICIAN REFERRAL PROCEDURE". The following relevant incidents of ministerial neglect demonstrate the State's noncompliance with the provisions set forth in section (B), which provides for the screening evaluation and scheduling of physician appointments according to urgency.

1. *Correction officers failed to notify the medical staff, between nurses' screenings, of the claimant's request to see a physician.*

According to subdivision (6) (a), "When an inmate requests care between screening sessions, a corrections officer will telephone a member of the health staff and shall provide the details of the inmate's condition. The health staff member shall conduct a medically pertinent inquiry into the inmate's condition, and determine whether the inmate should be seen by a member of the health staff prior to the next screening session". At 8:14 A.M. on January 4, the correction officer recorded "Inmate Kagan requested a doctor's appointment. She is on list for nurse's screening and is complaining of ear infection and ear bleeding". Here, the claimant expressly requested to be seen by a physician, but the officer breached the protocol when she did not telephone and thereby notify the medical staff. The timely telephone call would have alerted the nurse that it was urgent for the claimant to see a physician, and there would have been ample time to locate the doctor and schedule the claimant's appointment with him before he left the facility.

2. *There was no evidence that on January 4 the claimant was presented at the first screening session following her request.*

According to subdivision (5), "[s]creening shall be readily available to all members of the plaintiff class and shall be conducted at the first screening session following the inmate's

request". According to the notation on her health record, the claimant was not presented for screening until 2:30 P.M. on January 4, 1988. Nurse Rosado testified that "[t]he doctor came in at 8 o'clock every day" and with the exception of the January 4 screening, the health record notations indicate only mid-morning screening times. It is highly unlikely that 2:30 P.M. was the first available screening opportunity of the day since by that time the doctor had already left the facility.

3. *The need to schedule a doctor's appointment for the claimant was not noted on the sign-up list or the screening roster and was not placed on the physician's appointment list.*

According to subdivision (9), the individual's medical record should contain "the staff member's recommendations, and whether a doctor's appointment should be scheduled. A brief statement of this information shall be placed on either a separate screening roster or on the screening sign-up list". In addition, subdivision (10) requires that once the written notation is placed on the list or roster, it "shall be transmitted to the staff member responsible for scheduling physician appointments, who will place the inmate's name on the appropriate physicians's appointment list.

The health record which the court found to have been written on January 2, 1988 stated "F/U c MD", to be read "follow up with doctor". It is noteworthy that the date on this record appears to have been changed from January 2 to read January 20, and from 1987 to read 1988, thus casting the State's contentions in further doubt. In any event, this indicates the nurse's plan of treatment, i.e., that the claimant was to be seen by a physician. The sign-up sheet, as well as the screening roster for that date, which would reflect whether an appointment was to be made, are suspiciously and selectively missing, ostensibly due to a basement flood that destroyed these but not other related documents.

The claimant's January 4, 1988 health record indicates "App Dr. Tennan *[sic]* 1/4/88". No January 4 appointment was made for the claimant to see Dr. Tennen. Nurse Rosado, who made the notation, stated that, "I wanted her to be seen that day, and the doctor had left. So she was going to be seen the following morning". In fact, although Rosado testified that she made the appointment over the telephone, there was no record that any appointment was ever made for the claimant to see Dr. Tennen. The sign-up sheet was again missing for January 4, and the only doctor's appointment that was indicated on the screening roster for that date was made for *another inmate,*

not the claimant, to see Dr. Blumenfeld. Even when the claimant was presumably scheduled to see Dr. Tennen on January 5th, she was not called down for the typical 8 o'clock appointment but had to be "squeezed in" for an emergency appointment with him at the hospital after she exhibited symptoms of hearing loss, loss of equilibrium, repeated vomiting, and a bloody ear.

4. *The claimant's complete medical record was not available at two nurse's screenings.*

According to subdivision (9), "[t]he medical record of the inmate being screened shall be maintained * * * and shall be available to the health care provider at the time of screening". Because the claimant's January 2 health record starts at the top of the page and is out of sequence, it would appear that the claimant's medical record was not available for the nurse at the January 2 screening. Nurse Rosado testified that it is not unusual for this to occur, and that when it does, the customary practice is for the nurse to begin a blank new health record. Rosado's testimony indicates a continued and condoned breach of this administrative protocol.

The claimant's record was incomplete at the January 3 nurse's screening as well. The new page, containing the January 2 health record, and which documented a red throat, fever of 100.8 and a "FU c MD", was missing. Although health records are filled out sequentially by date, the January 3 entry followed the entry for December 29, 1987, instead of the one for January 2. This would indicate that the nurse at the January 3 screening did not have the benefit of the previous day's nurse's clinical findings and plan to follow up with a doctor's appointment. The lack of availability of the claimant's complete records for both the January 2 and 3 nurse's screening contributed to and postponed the claimant's access to a physician who could have provided a timely diagnosis and antibiotic intervention to protect her hearing.

5. *The claimant's reason to be seen at the nurse's screening as noted on the sign-up sheet was not transcribed onto the screening roster.*

According to subdivision (9), "[t]he medical record * * * shall include a description of the inmate's health complaint and condition". The protocol continues that "[a] brief statement of this information shall be placed on either a separate screening roster or on the screening sign up list". The screening roster for January 3 does not contain the "EAR BLEEDING" notation (emphasis in original), or the request to see Dr. Blumenfeld.

Nurse Rosado testified that the screening roster was made out by Nurse Patten, not the clerk. There appear to be gross and repeated deviations from protocol here because on that date *no* health problems were indicated for *any* patient whatsoever. The notation of the claimant's bleeding ear and request to see Dr. Blumenfeld on the nurse screening roster would have alerted the nurse to the seriousness of the claimant's health problem and could have possibly resulted in earlier medical intervention.

6. *The State failed to provide the claimant with a prompt, comprehensive hearing examination.*

Lastly, the court correctly found that the State was ministerially negligent because it did not provide the claimant with a comprehensive hearing test until more than six months after her injury. According to the applicable protocol, Bedford Hills was obligated to "institute, maintain and follow a system to coordinate the implementation and tracking of all physician orders so that care shall be provided within the time ordered, if any, and in any event, in a timely fashion. Such orders include outside consultations * * * diagnostic and laboratory tests and procedures * * * inside or outside the facility". The claimant testified that Dr. Blumenfeld repeatedly told her that she required a hearing test to determine if anything could be done to improve her hearing. It was Dr. Tennen who first requested an ear, nose, and throat (ENT) consultation on the claimant's health record, as early as January 25, 1988, about three weeks following the claimant's injury. Although the physician at Downstate Correctional Facility (hereinafter Downstate) was able to tell her that her hearing was lost because of an infection, he explained to her that Downstate was not adequately equipped to do a complete evaluation. The records were lost a second time, and she was sent to Butterfield Hospital, where she was told yet a third time that she required a standard hearing test, but that Butterfield, as well, was not equipped to perform it. It was not until June 1988 that she was finally sent to an adequate testing facility, Beth Israel Hospital in New York City. Even then, there were problems in scheduling the appointment and delivering the patient, and it was due to the insistence of the claimant, after she had been delivered on the wrong date, that the tests were finally performed.

A 1986 report entitled *State of the Prisons, Conditions Inside the Walls,* prepared by the Correctional Association of New York, found delays of up to six months in obtaining treatment

at outside hospitals because of, *inter alia,* overburdened facilities. The report continues that access depends "also on decisions and action within the prison", and cites the logistical problems of scheduling and providing transportation and security. Although the claimant once encountered a scheduling problem when transportation was not available for an appointment at Beth Israel Hospital, the medical staff was repeatedly remiss from January 25, 1988, when Dr. Tennen first requested an ENT evaluation, onward, because it did not diligently pursue and find an adequate testing facility for her for nearly six months. The foregoing thus clearly demonstrates how there were numerous ministerial breakdowns which combined to deprive the claimant of the adequate medical care to which she was entitled, and which cost her her hearing.

This Court stated in *Snow v State of New York* (98 AD2d 442, 447, *affd* 64 NY2d 745) that "[w]hile it would be inequitable to hold the State liable for honest errors in medical judgment committed by its agents, liability can and should ensue if that judgment was not based upon intelligent reasoning or upon adequate examination so that there has been a failure to exercise any professional judgment". The repeated failure of the State to abide by its administrative protocols and hence to fulfill its ministerial responsibilities falls within this area of liability and was a proximate contributing cause of the claimant's hearing loss.

### MALPRACTICE AND NEGLIGENCE

The State posits that the Court of Claims labeled its chosen theory "ministerial neglect" so as to distinguish it from medical malpractice. We may only speculate. The dissent, however, uses this as a springboard so as to analyze other possible theories of liability which it likewise finds lacking because it concludes that the harm to be prevented was not reasonably foreseeable. However, it is beyond cavil that the State owes a duty to provide medical care and treatment to its prisoners, which duty has been defined in terms of both negligence *(see, Matter of Farace v State of New York,* 176 AD2d 1228; *McCrossen v State of New York,* 277 App Div 1160), and medical malpractice *(see, Ogle v State of New York,* 191 AD2d 878; *Stanback v State of New York,* 163 AD2d 298, *supra; Larkin v State of New York,* 84 AD2d 438; *cf., Rivers v State of New York,* 159 AD2d 788). The dissent points to no controlling authority compelling a finding that the claimant's injuries were not reasonably foreseeable and that accordingly no duty was breached.

To the contrary, the cases strongly support a conclusion here that the claimant suffered injuries directly attributable to a breach of the State's duty to provide adequate medical care for its prisoners, and there was ample evidence from which the Court of Claims found the injury to be foreseeable.

It is well settled that "[d]uty in negligence cases is [not] defined * * * by foreseeability of injury" (*Strauss v Belle Realty Co.*, 65 NY2d 399, 402). Indeed, "[u]nlike foreseeability and causation, which are both generally factual issues to be resolved on a case-by-case basis by the fact-finder, the duty owed * * * is a legal issue to be determined by the court" (*Adams v Elgart*, 213 AD2d 436, 437; *see, Eiseman v State of New York*, 70 NY2d 175; *De Angelis v Lutheran Med. Ctr.*, 58 NY2d 1053). The case law leaves no doubt as to the existence of such a duty to provide for the health and care of prisoners (*see, Ogle v State of New York*, 191 AD2d 878, *supra; Matter of Farace v State of New York*, 176 AD2d 1228, *supra; Stanback v State of New York*, 163 AD2d 298, *supra; Larkin v State of New York*, 84 AD2d 438, *supra; McCrossen v State of New York*, 277 App Div 1160, *supra*). Therefore, in light of the overwhelming evidence that the medical staff breached this duty which clearly caused the claimant's hearing loss, the judgment may be sustained under either theory of malpractice or negligence.

While the dissent misjudges the actual facts of this case to conclude that the claimant's contentions are not supported by the record, the fact remains that in this case the claimant communicated legitimate medical complaints to prison personnel which were either ignored or discounted by the very individuals whose duty it was to listen and arrange for appropriate diagnosis and treatment. The evidence further establishes that the claimant's hearing was damaged as a direct result of these omissions.

The facts of this case are not unlike those of *Larkin v State of New York* (84 AD2d 438, *supra*), where a prisoner's repeated complaints of severe headaches were met with only cursory examinations and inappropriate care which failed to diagnose the aneurysm which took his life. This case is also analogous to *Stanback v State of New York* (163 AD2d 298, *supra*) where a prisoner's repeated complaints of pains in his knee were likewise ignored, thereby perpetuating the prisoner's suffering of a needless injury. A similar series of diagnostic blunders led to the failure to diagnose and treat a prisoner's tuberculosis in *Ogle v State of New York* (191 AD2d 878, *supra*). In those cases inmates were permitted to recover damages from the State as

a result of the negligent medical care they received from prison health care providers. The dissent has failed to demonstrate how the instant case is materially distinguishable. Rather, the claimant has both stated a cause of action and has proven her entitlement to recover damages for the State's failure to adequately diagnose and treat her condition, as well as for its failure to provide a hearing test for six months longer. Accordingly, we will not disturb the judgment on appeal insofar as it compensated the claimant for her injuries resulting from these two claims.

However, we do not contest the conclusion of the dissent that the claimant has failed to demonstrate her entitlement to an award of damages for the State's alleged failure to provide her with adequate bedding, as she has not established, *inter alia,* that this was a proximate cause of her subsequent illness.

SULLIVAN, J. (dissenting in part). Inasmuch as the evidence in the record fails to support the majority's conclusion that the claimant's loss of hearing resulted from any act or omission of personnel at the Bedford Hills Correctional Facility (hereinafter Bedford Hills), I would reverse the judgment and dismiss the claim.

The claimant had been incarcerated at Bedford Hills since 1984 pursuant to a manslaughter conviction. In early 1988, she developed an ear infection which rapidly caused her to permanently lose the hearing in her right ear. She subsequently brought this claim to recover for her hearing loss, contending that she received inadequate medical care at the prison. Specifically, the claimant alleged that the staff at the facility failed to comply with her requests for extra blankets while she was housed in a mental health unit of the prison in December 1987, that prison employees delayed in producing her for nurse screening on January 4, 1988, that the nursing staff failed to provide her with immediate access to a physician on that date, and that prison personnel thereafter unduly delayed in procuring a hearing test for her.

The trial evidence demonstrated that on January 2, 3, and 4, 1988, the claimant, complaining of various symptoms, requested and received "nurse screening", a process whereby inmates with health complaints are examined and evaluated by staff nurses, who then refer sufficiently serious cases to a physician on duty at the facility. The claimant was no stranger to the nurse screening procedure, having availed herself of visits to nurses on at least nine occasions in November and

December 1987 alone for such maladies as constipation, nasal congestion, a splinter in her thumb, and a blister on her right foot. On January 2, 1988, the claimant complained of a sore throat and fever, and was called to nurse screening in the late afternoon. As is clearly demonstrated by the medical record of the visit, the examining nurse found that the claimant's throat was red and that she had a temperature of 100.8 degrees. However, her throat did not contain any exudate and her glands were not swollen. Hence, a regimen of salt water gargles, throat lozenges, and Tylenol was prescribed. The claimant did not make any complaint about her ear on that date. Moreover, while the entry in the complainant's medical record for that date contained a notation regarding follow-up by a physician, the notation was followed by the letters "PRN" (i.e., "whenever necessary"), thus indicating that the claimant should be seen by a physician if her condition worsened. The notation did not, as the claimant contends, require a doctor's appointment or constitute an attempt to make such an appointment for the claimant. Indeed, the claimant herself testified that the examining nurse did not give her a doctor's appointment, but instead told her to see the screening nurse on the following day.

On January 3, the claimant returned to nurse screening complaining of a sore throat. The examining nurse found that her throat was red, but that her temperature had dropped to 98 degrees. The claimant also contends that she complained of bleeding in her ear at this time, but an ear examination was in fact conducted on that date and her ears were found to be negative for any problems. Extra Strength Tylenol and fluids were prescribed. The claimant signed up for nurse screening the following day, complaining that her ear was bleeding. At approximately 2:30 P.M. on that date, she appeared for nurse screening based on this complaint. The examining nurse found a "[v]ery small amount" of blood in the claimant's right ear canal, which the nurse believed might have resulted from a recent injury or from the claimant's insertion of a foreign object into her ear. The medical record does not indicate that the claimant had any other physical complaint. The nurse inquired as to whether a doctor was on duty to see the claimant, but was advised that the physician on duty had left for the day. In the exercise of her medical judgment, the nurse then determined that while the condition of the claimant's ear justified an examination by a doctor, it was not so urgently serious as to warrant calling in a physician for an immediate

evaluation. Accordingly, the claimant was given a doctor's appointment for the following morning. Unfortunately, the claimant's condition rapidly worsened in the interim, and according to her own testimony, she lost the hearing in her right ear on that night. At approximately 7:30 A.M. on January 5, she complained of ear problems and began vomiting. The prison hospital facility was contacted immediately, and the claimant was called for treatment at 8:47 A.M. Although no escort officers were immediately available to bring her to the facility at that time due to their performance of other assignments, an officer was thereafter made available and escorted the claimant to the hospital facility at 10:28 A.M. She was examined by a physician who diagnosed her condition as an ear infection and prescribed antibiotics. The infection was cured, but the claimant suffered a loss of hearing in her right ear. Between January 25, 1988 and June 20, 1988, the staff at Bedford Hills obtained several consultations with specialists for the claimant and repeatedly attempted to schedule appropriate hearing tests for her. These efforts eventually resulted in the testing and evaluation of the claimant at Beth Israel Medical Center, where her hearing loss was determined to be permanent.

The Court of Claims found that the nurse who saw the claimant on January 4 made a sound medical judgment and was not guilty of ordinary negligence or malpractice in scheduling a doctor's appointment for the claimant on the following day. However, the court determined that the State, through prison personnel, committed "ministerial negligence" in (1) failing to provide the claimant with adequate bedding material in December 1987, (2) failing to produce the claimant for the January 4 screening until approximately 2:30 P.M., when the on-duty physician had already left the premises, and (3) delaying approximately six months in obtaining appropriate hearing tests for the claimant. The court awarded total personal injury damages of $304,000, which included $500 for the claimant's alleged discomfort resulting from the purportedly inadequate bedding, and $3,000 for the anxiety which the claimant presumably experienced while awaiting a hearing test. I cannot agree with the majority that this verdict is supported by the record.

The Court of Claims premised its finding of liability against the State exclusively upon a theory of ministerial negligence, a theory upon which the claimant and the majority also currently rely. However, as the State accurately contends, the ac-

tions complained of in this case were clearly discretionary rather than ministerial in nature. The Court of Appeals explained the difference between these two types of conduct in *Tango v Tulevech* (61 NY2d 34, 41) as follows: "discretionary * * * acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result". The distinction is significant, since "when official action involves the exercise of discretion, the [public] officer is not liable for the injurious consequences of that action even if resulting from negligence or malice. Conversely, when the action is exclusively ministerial, the officer will be liable if it is otherwise tortious and not justifiable pursuant to statutory command" *(Tango v Tulevech, supra,* at 40).

None of the conduct which the claimant argues was the cause of her injury in this case involved a government officer's failure to perform an official act which is ministerial in nature. Indeed, the claimant has failed to point to any compulsory requirement that inmates be provided extra blankets or hearing tests immediately upon demand, or that they are entitled to see a physician upon request without first undergoing evaluation by a nurse. Further, the nature and scope of the medical treatment accorded the claimant was clearly discretionary in nature, inasmuch as it obviously involved the exercise of reasoned judgment.

Moreover, contrary to the majority's analysis, a review of the administrative protocols of Bedford Hills actually supports the conclusion that the care and treatment received by the claimant fell within accepted medical and legal standards. As the protocols make clear, the claimant was not entitled to see a physician upon request because Bedford Hills provided a nurse screening procedure for the evaluation of inmate health complaints. The majority states that prison personnel violated the protocol requiring that "[s]creening shall be readily available to all [inmates] and shall be conducted *at the first screening session following the inmate's request"* (emphasis supplied). The majority apparently reasons that since the claimant was not examined by a nurse until approximately 2:30 P.M. on January 4, 1988, she was not produced for the first screening on that date. However, there is absolutely no evidence to support such a conclusion (indeed, there is not even any indication in the record that there was more than one screening session conducted on that date). The mere fact that the January 4

screening session was conducted in the afternoon hardly demonstrates a departure from the protocols or an undue delay in providing the claimant with medical attention. Rather, the documentary evidence and the claimant's own testimony establish that nurse screening was conducted during the afternoon hours on other occasions, including January 2 and January 5, and one of the claimant's own witnesses, a former fellow inmate, testified that inmates were routinely called to nurse screening in the afternoon or evening. Hence, there is simply no proof of a violation of this protocol.

The majority similarly finds that prison personnel failed to have the claimant's medical record available during nurse screening, thereby violating the protocol requirement that "[t]he medical record of the inmate being screened * * * shall be available to the health care provider at the time of screening". Again, the conclusion is belied by the record, since the nurse who conducted the critical screening on January 4 testified that the claimant's medical record, complete with prior entries, was available at the time she saw the claimant. Additionally, the majority's argument that the claimant's injury was caused in part by a failure to transcribe information regarding her health problems from the sign-up sheet to the screening roster as required by the protocols is without merit. In fact, the roster for January 4 *did* contain the requisite notation, since the entry thereon precisely corresponded to the claimant's subjective complaint on that date as well as to the screening nurse's findings upon examining her. The majority correctly observes that the claimant's January 3 health complaint (allegedly that her ear was painful and bleeding) was never transferred from the sign-up sheet to the screening roster for that date. However, the majority's conclusion that a transfer of the notation "would have alerted the nurse to the seriousness of the claimant's health problem and could have possibly resulted in earlier medical intervention" is unpersuasive. Indeed, notwithstanding the omission of the subjective complaint from the January 3 roster, the medical record from that date unequivocally demonstrates that the claimant's ears *were examined at that time and found to be negative for any symptoms.* Hence, the omission of the claimant's subjective complaint from the roster did not alter the examination performed by the nurse and quite simply could not have caused or contributed to her hearing loss.

The majority finds that the protocols were also violated by a failure of the security staff to transmit the claimant's subjec-

tive complaints to medical personnel. However, the sole documentary evidence of such a failure consists of a log entry indicating that the claimant complained to a correction officer of problems with her ears on the morning of January 4. The entry did not state that medical personnel were notified, although it did observe that the claimant was already scheduled for nurse screening on that day. As previously noted, the claimant was seen by a nurse later that day and her condition was found not to require the immediate attention of a physician. Accordingly, any failure to comply with the notification protocol on this single occasion neither caused nor was even relevant to the claimant's subsequent hearing loss. The only other documentation regarding the claimant's complaints indicates that on the following day, she complained of ear problems and she began to vomit. The correction officer who observed her made a log entry and immediately contacted the medical staff, which in turn advised that the claimant would be seen by a doctor shortly thereafter (which she was). Hence, the notification protocol was followed on January 5.

The majority further reasons that since the claimant was not provided with a comprehensive hearing test until some six months following her hearing loss, prison personnel also violated a protocol requiring that outside medical testing for inmates be secured in a timely fashion. However, the record is replete with evidence demonstrating that different health care professionals at Bedford Hills obtained several otolaryngology consultations for the claimant and made repeated efforts to have her hearing tested at various outside facilities. Unlike the majority, I do not find that the delay in procuring the testing was occasioned by any breach of protocol on the part of Bedford Hills employees, but was instead attributable to scheduling difficulties and some apparent misunderstandings with the outside facilities. Moreover, it is quite clear that the testing delay did not in any manner contribute to or aggravate the claimant's physical condition, inasmuch as the evidence overwhelmingly demonstrates that her hearing loss was permanent from the outset.

In view of the foregoing, the ministerial negligence theory advanced by the trial court and expanded upon by the majority is illusory. Indeed, even if one were to accept the premise that the protocols at Bedford Hills created strict ministerial duties on the part of prison personnel, the purported breaches of these protocols cited by the majority either never occurred or had absolutely no causational impact on the claimant's condition.

The majority goes beyond the trial court's determination and also finds the State responsible for the claimant's injuries upon theories of ordinary negligence and medical malpractice. I disagree. It is undisputed that the State has a duty of ordinary care to provide reasonable and adequate medical care to prison inmates *(see, Cauley v State of New York,* — AD2d —, 1996 NY Slip Op 00737 [2d Dept, Feb. 5, 1996]; *Marchione v State of New York,* 194 AD2d 851; *Matter of Farace v State of New York,* 176 AD2d 1228; *Rivers v State of New York,* 159 AD2d 788; *Powlowski v Wullich,* 102 AD2d 575). Moreover, while foreseeability of injury does not determine *the existence* of the duty *(see, Strauss v Belle Realty Co.,* 65 NY2d 399; *Adams v Elgart,* 213 AD2d 436), "the *scope* of the State's duty is the standard formulation that '[t]he risk reasonably to be perceived defines the duty to be obeyed' *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 344)" *(Gordon v City of New York,* 120 AD2d 562, 563, *affd* 70 NY2d 839 [emphasis supplied]).

Central to the majority's ordinary negligence argument is the fact that prison personnel did not call the claimant to nurse screening on January 4 until approximately 2:30 P.M. However, this circumstance fails to establish any negligence on the part of the State. As previously noted, the performance of nurse screening during the afternoon did not constitute a departure from the standard procedure of the prison, and there was ample proof that such screening was often held in the afternoon hours. Hence, the mere fact that the claimant had sometimes been called to nurse screening in the morning failed to create a duty on the part of prison staff to conduct nurse screening during the morning hours every day or to call her at some earlier point on January 4. Similarly, there was no medical evidence that the claimant's condition was so serious on that date as to warrant that she be produced for nurse screening at an earlier hour. Indeed, the majority concludes that the claimant's condition became progressively worse from January 2 to January 4, but that conclusion is not supported by any objective medical documentation. Rather, the record demonstrates that although the claimant complained on January 3 that her ear was bleeding, she was examined on that date by a nurse who found that her temperature and her ears were normal. Hence, from all outward appearances, the claimant's condition had markedly improved from the previous day when she had been running a fever of 100.8 degrees, and the objective medical documentation unequivocally refuted her subjective complaint that her ear was bleeding on January 3. Under

these circumstances, her subjective complaint made to a correction officer on the morning of January 4 that her ear was bleeding did not establish the existence of a medical emergency requiring that she be brought to nurse screening before the scheduled hour, nor was the State negligent in failing to vary the screening schedule at the prison for her benefit.

Similarly, the actions of the examining nurse on January 4 failed to constitute either negligence or malpractice. In fact, the trial court expressly determined that the conduct of the nurse in making a doctor's appointment for the claimant for the following day constituted "a medical judgment based upon the exercise of reasonable care". There is no basis in the record for disturbing this conclusion, inasmuch as conflicting medical testimony was offered on the issue, and the court was entitled to accept the testimony of the State's witnesses and to reject that of the claimant's expert *(see, Connolly v Pastore,* 203 AD2d 412; *Marchione v State of New York,* 194 AD2d 851, *supra).* Inasmuch as there was competent evidence that the examination conducted by the nurse was medically appropriate and that her observation of a small amount of blood in the claimant's ear did not mandate that the claimant be seen by a physician immediately, the record amply supports the court's determination in this regard *(see, Cauley v State of New York, supra; Wilson v State of New York,* 112 AD2d 366). Moreover, "[w]hether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant's acts or omissions *(Danielenko v Kinney Rent A Car,* 57 NY2d 198, 204)" *(Gordon v City of New York,* 70 NY2d 839, 841, *supra).* Inasmuch as the nurse's examination of the claimant did not reveal, nor does the record contain, any objective medical findings which demonstrated that prison staff should have reasonably foreseen that the claimant's condition would substantially worsen overnight, "[the State's] conduct was reasonable in light of what could have been anticipated, there [was] no breach of duty, no negligence and no liability" *(Gordon v City of New York, supra,* at 841; *see, e.g., Cauley v State of New York, supra).*

Furthermore, the claimant's argument that the State was negligent in failing to have her examined by a doctor more promptly on the morning of January 5 is patently without merit. The record demonstrates that she complained of her ear bleeding at 7:30 A.M. on that date, whereupon the officer on duty immediately contacted the medical staff. At 8:47 A.M., she was directed to be sent to the physician on duty. At that time,

all escort officers were on other assignments and no one was immediately available to take her to the doctor. Nevertheless, an officer was in fact made available and escorted her to the physician at 10:28 A.M. This three-hour time lapse can hardly be characterized as an undue delay, especially when one considers that an escort officer was required to accompany the claimant, an essential security measure given her violent criminal history and her unstable psychiatric background. Moreover, even if the delay could be viewed as unreasonable, it was incumbent upon the claimant to demonstrate that the delay proximately caused her injury. Since she testified that she lost her hearing during the preceding night, proximate causation was negated *(see, Marchione v State of New York,* 194 AD2d 851, *supra; Brown v State of New York,* 192 AD2d 936).

The cases upon which the majority relies are factually inapposite to the matter at bar. In *Ogle v State of New York* (191 AD2d 878), an inmate successfully sued for the failure of prison personnel to timely diagnose and treat his spinal tuberculosis. However, in that case, the inmate repeatedly complained of symptoms at various correctional facilities *over a period of several months* and was never properly tested or treated during that period. Similarly, in *Stanback v State of New York* (163 AD2d 298), an inmate injured his knee in prison and continuously complained of symptoms at five different facilities *over the next three and one-half years,* but was consistently misdiagnosed and treated inappropriately during that interval. Likewise, in *Larkin v State of New York* (84 AD2d 438), an inmate complained of worsening symptoms on an almost daily basis *for more than one month,* but never received appropriate diagnostic testing and eventually died from a curable aneurysm. Contrary to the majority's analysis, the instant case, which involved a time frame of 3 to 4 days during which the claimant intermittently showed signs of improvement, is not even remotely analogous to the decisions which it cites.

Furthermore, in the absence of proof of the surrounding objective circumstances, the record completely fails to sustain the speculative claim regarding the alleged inadequate bedding provided to the claimant in December 1987. Moreover, even if the inadequacy of the bedding had been established, there was no evidence that it was either a proximate or aggravating cause of the claimant's ensuing illness and her subsequent hearing loss *(see, e.g., Marchione v State of New York, supra).* Additionally, as previously observed, the claimant similarly failed to establish that the six-month time lapse

between her loss of hearing and her receipt of a comprehensive hearing examination either constituted an unreasonable delay or was attributable to any negligence on the part of Bedford Hills personnel. Of course, even if she had succeeded in demonstrating these requisite elements, it is clear from the record that the delay in such testing did not cause or contribute to her hearing loss.

While the claimant's hearing impairment is indeed unfortunate, that fact alone does not render it compensable, nor can hindsight constitute an acceptable substitute for evidence of true negligence. The record unequivocally demonstrates that the prison staff, based on the facts known to them and upon the attendant circumstances, rendered reasonably adequate and prompt care to the claimant. Accordingly, I would reverse the judgment and dismiss the claim in its entirety.

PIZZUTO, ALTMAN and FRIEDMANN, JJ., concur with MILLER, J. P.; SULLIVAN, J., dissents in part in a separate opinion.

Ordered that the judgment is modified, on the law, by deleting the provision thereof which awarded the claimant $500 for damages allegedly resulting from the State's alleged failure to provide adequate bedding; as so modified, the judgment is affirmed, with costs to the claimant.