■ ANTOINETTE BLACK, as Temporary Administrator of the Estate of SERGIO BLACK, Deceased, Respondent-Appellant, v STATE OF NEW YORK, Appellant-Respondent. (Claim No. 115567.) (Appeal No. 1.) [999 NYS2d 921]—Appeal and cross appeal from an order of the Court of Claims (Diane L. Fitzpatrick, J.), entered February 20, 2013. The order determined that, for the purposes of determining the discount rate under CPLR 5031, the date of decision is March 30, 2012.

Appeal from a judgment of the Court of Claims (Diane L. Fitzpatrick, J.), entered April 19, 2013. The judgment awarded decedent money damages after a trial.

It is hereby ordered that the judgment so appealed from is unanimously affirmed without costs.

Memorandum: Sergio Black (decedent) commenced this action seeking damages for personal injuries allegedly caused by negligent medical care provided to him by defendant while he was in a state prison. Defendant appeals from a judgment awarding damages to decedent based upon a determination by the Court of Claims that a prison physician committed medical malpractice. Claimant, as temporary administrator of decedent's estate, was substituted as respondent on this appeal because decedent died shortly after the judgment was entered.

The evidence at trial established that, during his incarceration, decedent was injured several times in the summer of 2006 while playing basketball or lifting weights. The resulting injuries resolved relatively quickly and decedent thereafter returned to his customary activities. Decedent was again injured playing basketball on November 8, 2006. On that occasion, decedent's neck was bent backwards when he collided with another inmate. The prison physician's initial diagnosis was that decedent had suffered a "stinger," a relatively minor

spinal nerve injury, which would resolve on its own within a few days. When the injury did not resolve by November 13th, however, the prison physician ordered an MRI of decedent's spine, which occurred two days later. The prison physician had not yet received the MRI report when he saw decedent again on November 20th, and he directed prison personnel to obtain the report and forward it to him as soon as possible. Later that day, the prison physician received the report, which indicated that decedent had significant spinal stenosis, a condition in which the narrowing of the spinal canal causes pressure on the spinal cord, and myelomalacia, a softening of the spinal cord. The prison physician concluded that decedent's condition was serious and justified an expert consultation to ascertain the proper course of action, but that it did not require immediate emergency intervention. While awaiting approval for a neurological consultation, decedent further injured his cervical spine when he fell in his prison cell on December 18th. The resulting injuries rendered him a paraplegic with only limited use of his hands. Decedent's condition did not improve, and he died shortly after he was released from prison, during the pendency of this appeal.

At the trial of the claim, decedent relied upon expert testimony from a neurologist who opined that the prison physician deviated from the standard of care by, among other things, failing to obtain prompt and adequate medical treatment for decedent. The expert further opined that the prison physician was negligent in prescribing neurontin because its side effects included ataxia and dizziness. He opined that the medication was counterindicated for decedent because of his spinal condition, which made him prone to falling even without the medication. The court found in its decision that defendant was "100 percent responsible for [decedent]'s injuries as a result of the failure to promptly refer [decedent] for a neurological consultation evaluation and treatment from November 20, 2006." Judgment was entered on that decision and defendant appeals therefrom.

On appeal from a judgment entered after a nonjury trial, this Court has the power "to set aside the trial court's findings if they are contrary to the weight of the evidence" and to render the judgment we deem warranted by the facts (*Larkin v State of New York*, 84 AD2d 438, 444 [1982]; *see Anastasio v Bartone*, 22 AD3d 617, 617 [2005]). That power may be appropriately exercised, however, only after giving due deference to the court's "evaluation of the credibility of witnesses and quality of the proof" (*Ogle v State of New York*, 191 AD2d 878, 880 [1993];

*see Anastasio*, 22 AD3d at 617-618). Moreover, "[o]n a bench trial, the decision of the fact-finding court should not be disturbed upon appeal unless it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence" (*Claridge Gardens v Menotti*, 160 AD2d 544, 544-545 [1990]).

Here, giving due deference to the assessment of the evidence by the court, we conclude that a fair interpretation of the evidence supports its determination that defendant breached its duty to provide claimant's decedent with adequate medical care, resulting in his catastrophic injuries (*see Andrews v County of Cayuga*, 96 AD3d 1477, 1477-1478 [2012]; *Farace v State of New York*, 266 AD2d 870, 870-871 [1999]; *Kagan v State of New York*, 221 AD2d 7, 8 [1996]). Decedent's expert testified credibly, based upon his review of decedent's medical records and his examination of decedent, that the prison physician deviated from accepted standards of medical practice when he failed to recognize the urgency of decedent's condition and to make a prompt referral to a neurologist (*see Larkin*, 84 AD2d at 445). There is no basis in the record for rejecting that opinion (*see Fuller v Preis*, 35 NY2d 425, 431-432 [1974]). We reject defendant's contention that the opinion of decedent's expert should be given no weight because his expertise is in the area of neurology, while the prison physician is an internist. The expertise of decedent's expert does not imply a lack of familiarity with the standards applicable to a general practitioner or internist (*see Hoagland v Kamp*, 155 AD2d 148, 151 [1990]). Moreover, decedent's expert testified that, before becoming a neurologist, he had been employed as a general practitioner, and he was even employed as a general medical officer at a federal correctional facility. In addition, after he began practicing neurology, decedent's expert trained physicians working in family practice and internal medicine to conduct neurological examinations. Thus, claimant established an adequate foundation demonstrating his expert's familiarity with the standard of care that was the subject of the expert's testimony (*see id.* at 150), and the expert in fact testified about the treatment rendered to decedent in light of the standard applicable to all physicians (*see Kelly v State of New York*, 259 AD2d 962, 963 [1999]).

We further conclude that the opinion of decedent's expert that decedent's injuries were caused by defendant's negligence is based on facts that "were either established or fairly inferable from the evidence" (*Naveja v Hillcrest Gen. Hosp.*, 148 AD2d 429, 430 [1989]; *see Stringile v Rothman*, 142 AD2d 637,

639 [1988]). Decedent's MRI report indicated, in relevant part, that there was "[s]evere stenosis" at C3-4 with evidence of myelomalacia in the spinal cord, among other abnormalities. The prison physician acknowledged that spinal cord stenosis could lead to permanent paralysis, but he concluded that the MRI report reflected a degenerative process rather than an acute condition requiring immediate intervention. Decedent's expert countered, however, that the prison physician failed to take into account decedent's clinical picture when he discounted the urgency of decedent's condition. The evidence at trial established that decedent's condition deteriorated precipitously between his basketball injury on November 8 and his fall on December 18. Prior to November 8, decedent, then a 35-year-old Marine Corps veteran, lifted weights and played basketball regularly. Following that date, he was in constant pain and had progressively increasing problems with mobility. He was unable to walk without assistance, and he twice requested a wheelchair before his collapse. Decedent and claimant both testified that decedent's condition was worsening as of November 20, and they each recalled becoming increasingly concerned about decedent's deteriorating condition and defendant's delay in addressing it. Decedent made repeated requests to discuss the MRI results with the prison physician, and even sought the prison warden's intervention regarding those requests. The prison physician, however, did not reevaluate decedent's condition to determine if it had worsened after receiving the MRI report. We note that, to the extent that decedent's medical records did not fully document his deteriorating condition, the lack of documentation is the result of the prison physician's failure to reexamine him or otherwise reevaluate his condition.

In sum, the record supports the opinion of decedent's expert that the MRI report, coupled with "the accelerating nature of [decedent's] symptoms," demanded immediate action, which the prison physician neglected to take (see *Larkin*, 84 AD2d at 445). The prison physician conceded that he was aware, at least as of November 20, that referral to a neurologist was necessary, and a fair interpretation of the evidence supports the court's conclusion that his failure to recognize the urgency of that referral and to ensure that decedent received appropriate treatment constituted malpractice (see *Dockery v Sprecher*, 68 AD3d 1043, 1046 [2009]; *Kelly*, 259 AD2d at 963; *Larkin*, 84 AD2d at 445).

We reject the contention of defendant that it could have done nothing to obtain the necessary referral and treatment prior to

decedent's collapse on December 18 and, thus, that any negligence on the part of the prison physician did not proximately cause decedent's injuries. The record establishes that the prison physician defined the level of urgency that triggered the administrative protocols for scheduling appointments, and the lack of urgency that he reported resulted in the scheduling of a referral beyond December 18. In any event, as the court properly concluded, decedent was dependent on defendant for adequate medical care, and he should not suffer the consequences resulting from either the failure to recognize the urgency and risks of his condition or the failure of prompt and efficient internal procedures for obtaining a referral to and treatment by a specialist (*see Andrews*, 96 AD3d at 1478; *Kagan*, 221 AD2d at 11).

Inasmuch as the weight of the evidence supports the court's determination that defendant breached its duty to provide decedent with adequate medical care, we need not address the court's further determination that the prison physician's administration of neurontin to decedent constituted malpractice. Present—Scudder, P.J., Smith, Peradotto, Carni and Sconiers, JJ.