# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**1197**
**CA 14-00317**
PRESENT: SCUDDER, P.J., SMITH, PERADOTTO, CARNI, AND SCONIERS, JJ.

---

ANTOINETTE BLACK, AS TEMPORARY ADMINISTRATOR OF
THE ESTATE OF SERGIO BLACK, DECEASED,
CLAIMANT-RESPONDENT,

                      V                              MEMORANDUM AND ORDER

STATE OF NEW YORK, DEFENDANT-APPELLANT.
(CLAIM NO. 115567.)
(APPEAL NO. 2.)

---

ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL, ALBANY (ROBERT M. GOLDFARB OF
COUNSEL), FOR DEFENDANT-APPELLANT.

FRANZBLAU DRATCH, P.C., NEW YORK CITY (STEPHEN N. DRATCH OF COUNSEL),
FOR CLAIMANT-RESPONDENT.

---

      Appeal from a judgment of the Court of Claims (Diane L.
Fitzpatrick, J.), entered April 19, 2013. The judgment awarded
decedent money damages after a trial.

      It is hereby ORDERED that the judgment so appealed from is
unanimously affirmed without costs.

      Memorandum: Sergio Black (decedent) commenced this action
seeking damages for personal injuries allegedly caused by negligent
medical care provided to him by defendant while he was in a state
prison. Defendant appeals from a judgment awarding damages to
decedent based upon a determination by the Court of Claims that a
prison physician committed medical malpractice. Claimant, as
temporary administrator of decedent's estate, was substituted as
respondent on this appeal because decedent died shortly after the
judgment was entered.

      The evidence at trial established that, during his incarceration,
decedent was injured several times in the summer of 2006 while playing
basketball or lifting weights. The resulting injuries resolved
relatively quickly and decedent thereafter returned to his customary
activities. Decedent was again injured playing basketball on November
8, 2006. On that occasion, decedent's neck was bent backwards when he
collided with another inmate. The prison physician's initial
diagnosis was that decedent had suffered a "stinger," a relatively
minor spinal nerve injury, which would resolve on its own within a few
days. When the injury did not resolve by November 13th, however, the
prison physician ordered an MRI of decedent's spine, which occurred

two days later.  The prison physician had not yet received the MRI report when he saw decedent again on November 20th, and he directed prison personnel to obtain the report and forward it to him as soon as possible.  Later that day, the prison physician received the report, which indicated that decedent had significant spinal stenosis, a condition in which the narrowing of the spinal canal causes pressure on the spinal cord, and myelomalacia, a softening of the spinal cord. The prison physician concluded that decedent's condition was serious and justified an expert consultation to ascertain the proper course of action, but that it did not require immediate emergency intervention. While awaiting approval for a neurological consultation, decedent further injured his cervical spine when he fell in his prison cell on December 18th.  The resulting injuries rendered him a paraplegic with only limited use of his hands.  Decedent's condition did not improve, and he died shortly after he was released from prison, during the pendency of this appeal.

At the trial of the claim, decedent relied upon expert testimony from a neurologist who opined that the prison physician deviated from the standard of care by, among other things, failing to obtain prompt and adequate medical treatment for decedent.  The expert further opined that the prison physician was negligent in prescribing neurontin because its side effects included ataxia and dizziness.  He opined that the medication was counterindicated for decedent because of his spinal condition, which made him prone to falling even without the medication.  The court found in its decision that defendant was "100 percent responsible for [decedent]'s injuries as a result of the failure to promptly refer [decedent] for a neurological consultation evaluation and treatment from November 20, 2006."  Judgment was entered on that decision and defendant appeals therefrom.

On appeal from a judgment entered after a nonjury trial, this Court has the power "to set aside the trial court's findings if they are contrary to the weight of the evidence" and to render the judgment we deem warranted by the facts (*Larkin v State of New York*, 84 AD2d 438, 444; *see Anastasio v Bartone*, 22 AD3d 617, 617).  That power may be appropriately exercised, however, only after giving due deference to the court's "evaluation of the credibility of witnesses and quality of the proof" (*Ogle v State of New York*, 191 AD2d 878, 880; *see Anastasio*, 22 AD3d at 617-618).  Moreover, "[o]n a bench trial, the decision of the fact-finding court should not be disturbed upon appeal unless it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence" (*Claridge Gardens v Menotti*, 160 AD2d 544, 544-545).

Here, giving due deference to the assessment of the evidence by the court, we conclude that a fair interpretation of the evidence supports its determination that defendant breached its duty to provide claimant's decedent with adequate medical care, resulting in his catastrophic injuries (*see Andrews v County of Cayuga*, 96 AD3d 1477, 1477-1478; *Farace v State of New York*, 266 AD2d 870, 870-871; *Kagan v State of New York*, 221 AD2d 7, 8).  Decedent's expert testified credibly, based upon his review of decedent's medical records and his

examination of decedent, that the prison physician deviated from
accepted standards of medical practice when he failed to recognize the
urgency of decedent's condition and to make a prompt referral to a
neurologist (*see Larkin*, 84 AD2d at 445).  There is no basis in the
record for rejecting that opinion (*see Fuller v Preis*, 35 NY2d 425,
431-432).  We reject defendant's contention that the opinion of
decedent's expert should be given no weight because his expertise is
in the area of neurology, while the prison physician is an internist.
The expertise of decedent's expert does not imply a lack of
familiarity with the standards applicable to a general practitioner or
internist (*see Hoagland v Kamp*, 155 AD2d 148, 151).  Moreover,
decedent's expert testified that, before becoming a neurologist, he
had been employed as a general practitioner, and he was even employed
as a general medical officer at a federal correctional facility.  In
addition, after he began practicing neurology, decedent's expert
trained physicians working in family practice and internal medicine to
conduct neurological examinations.  Thus, claimant established an
adequate foundation demonstrating his expert's familiarity with the
standard of care that was the subject of the expert's testimony (*see
id.* at 150), and the expert in fact testified about the treatment
rendered to decedent in light of the standard applicable to all
physicians (*see Kelly v State of New York*, 259 AD2d 962, 963).

     We further conclude that the opinion of decedent's expert that
decedent's injuries were caused by defendant's negligence is based on
facts that "were either established or fairly inferable from the
evidence" (*Naveja v Hillcrest Gen. Hosp.*, 148 AD2d 429, 430; *see
Stringile v Rothman*, 142 AD2d 637, 639).  Decedent's MRI report
indicated, in relevant part, that there was "[s]evere stenosis" at C3-
4 with evidence of myelomalacia in the spinal cord, among other
abnormalities.  The prison physician acknowledged that spinal cord
stenosis could lead to permanent paralysis, but he concluded that the
MRI report reflected a degenerative process rather than an acute
condition requiring immediate intervention.  Decedent's expert
countered, however, that the prison physician failed to take into
account decedent's clinical picture when he discounted the urgency of
decedent's condition.  The evidence at trial established that
decedent's condition deteriorated precipitously between his basketball
injury on November 8 and his fall on December 18.  Prior to November
8, decedent, then a 35-year-old Marine Corps veteran, lifted weights
and played basketball regularly.  Following that date, he was in
constant pain and had progressively increasing problems with mobility.
He was unable to walk without assistance, and he twice requested a
wheelchair before his collapse.  Decedent and claimant both testified
that decedent's condition was worsening as of November 20, and they
each recalled becoming increasingly concerned about decedent's
deteriorating condition and defendant's delay in addressing it.
Decedent made repeated requests to discuss the MRI results with the
prison physician, and even sought the prison warden's intervention
regarding those requests.  The prison physician, however, did not
reevaluate decedent's condition to determine if it had worsened after
receiving the MRI report.  We note that, to the extent that decedent's
medical records did not fully document his deteriorating condition,
the lack of documentation is the result of the prison physician's

failure to reexamine him or otherwise reevaluate his condition.

     In sum, the record supports the opinion of decedent's expert that the MRI report, coupled with "the accelerating nature of [decedent's] symptoms," demanded immediate action, which the prison physician neglected to take (*see Larkin*, 84 AD2d at 445).  The prison physician conceded that he was aware, at least as of November 20, that referral to a neurologist was necessary, and a fair interpretation of the evidence supports the court's conclusion that his failure to recognize the urgency of that referral and to ensure that decedent received appropriate treatment constituted malpractice (*see Dockery v Sprecher*, 68 AD3d 1043, 1046; *Kelly*, 259 AD2d at 963; *Larkin*, 84 AD2d at 445).

     We reject the contention of defendant that it could have done nothing to obtain the necessary referral and treatment prior to decedent's collapse on December 18 and, thus, that any negligence on the part of the prison physician did not proximately cause decedent's injuries.  The record establishes that the prison physician defined the level of urgency that triggered the administrative protocols for scheduling appointments, and the lack of urgency that he reported resulted in the scheduling of a referral beyond December 18.  In any event, as the court properly concluded, decedent was dependent on defendant for adequate medical care, and he should not suffer the consequences resulting from either the failure to recognize the urgency and risks of his condition or the failure of prompt and efficient internal procedures for obtaining a referral to and treatment by a specialist (*see Andrews*, 96 AD3d at 1478; *Kagan*, 221 AD2d at 11).

     Inasmuch as the weight of the evidence supports the court's determination that defendant breached its duty to provide decedent with adequate medical care, we need not address the court's further determination that the prison physician's administration of neurontin to decedent constituted malpractice.

Entered:  February 13, 2015                    Frances E. Cafarell
                                               Clerk of the Court